CHICAGO, ROCK ISLAND AND PACIFIC R. R. Co. *et al.*

*v.*

THEODORE W. KENNEDY *et al.*

1. NOTICE. Whatever is sufficient to put a party upon inquiry which would lead to the truth, is, in all respects, equal to, and must be regarded as, notice.

2. SAME—*who are chargeable with.* If a subsequent purchaser acts in bad faith, and wilfully or negligently shuts his eyes against those lights which, with proper observation, would lead him to a knowledge of facts affecting the subject of his purchase, he will be held to have notice of such facts.

3. SAME—*recitals in a deed.* The recitals in a deed in the chain of title, are such notice to a purchaser as would put him on inquiry as to the nature and extent of the matters referred to in the recitals.

4. SAME—*to what extent recitals in a deed put a party on inquiry.* In this case, the owner of a tract of land had, in his lifetime, executed a trust deed to secure the payment of an indebtedness, with a power of sale upon default in payment. The indebtedness was paid after the death of such owner, but the trustee afterwards sold under the deed, to parties who had notice of such payment. Before any sale was made by the purchaser, there were put upon record, in the office of the recorder of deeds of the county where the land was situated, a power of attorney from one to another of the heirs, in which was a recital that by the act of one of the purchasers at the trustee's sale, naming him, and others, the rights of some of the heirs had become involved; also, two mortgages on said premises, executed by a part of the heirs, in both of which it was recited that a suit had been commenced by such heirs to recover their interest in the land, giving the title and purpose of such suit, and that such suit had been dismissed by agreement of counsel, without adjudication: *Held,* that the recitals in the power of attorney and mortgages were sufficient to put subsequent purchasers upon inquiry as to the truth of the recitals,

and to charge them with notice of everything disclosed by the records, in the proceedings mentioned in such recitals, and of everything which they could have reasonably learned by inquiring in the direction to which the recitals pointed.

5. TRUST DEED—*effect of sale before default.*   Where a deed of trust confers upon the trustee power to sell, upon default in payment of the debt thereby secured, a sale made without such default to one who has, or who is chargeable with notice that there has been no default, can not confer anything beyond the legal title in trust for the benefit of the grantor in the trust deed, or, if he be dead, of his heirs.

6.   Under a deed of trust, with power of sale upon default in payment of the debt thereby secured, the power of sale does not become operative until there is such default, and a sale, made after the debt has been paid, is voidable as against a purchaser with notice, or the grantee of such purchaser with like notice.

7.   SAME—*who may become purchasers.*   When a party executes a deed of trust to secure the payment of money, and dies, leaving children, some of whom are adults and some minors, and the property is sold under the deed of trust in default of payment of the debt thereby secured, there is no reason why the adult heirs may not purchase the same at such sale, and acquire title thereby, unless prevented by occupying a fiduciary relation to the other heirs.

8.   MINORS—*power of next friend in a suit.*   A next friend can only claim and pursue the rights of a minor, and is powerless to yield or cede them to others, and the same is true of an attorney.

9.   Where a suit is brought by a minor by his next friend, and, by agreement of the attorneys in the case, it is dismissed, the rights of the minor are not affected, nor is he thereby estopped from afterwards suing upon the same cause of action.

10.   SAME—*laches.*   A delay of four years after minors have become of age, is not such *laches* as to prevent their obtaining relief against a fraudulent sale of their real estate, made while they were minors, where no rights have been acquired by other persons, or material change in the property occurred, after they arrived of age and before suit brought.

11.   ESTOPPEL.   A party, who was an adult, claimed an interest in certain land, and executed to his brother-in-law a power of attorney, authorizing him to sue for and recover his interest in such land, and to mortgage and incumber the same, and also executed a mortgage to an attorney at law, reciting that such attorney had brought suit for the recovery of his interest in the land, in and by which mortgage he agreed to give said attorney a certain portion of whatever interest was recovered. Afterwards, by consent and agreement of both the said attorney in fact and attorney at law, on the one side, and the parties and attorneys on the other side,

the suit was settled, and the land in controversy was sold under a mortgage, which was one of the subjects of controversy in the suit, and the claimant received a portion of the proceeds of such sale: *Held*, that he was bound by this arrangement made by his attorney at law and in fact, and could not afterwards set up any claim to the land.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. McCAGG, FULLER & CULVER, for the appellant company.

Messrs. JOHNSTON, ROGERS & APPLETON, and Mr. JAMES FELCH, for appellee William Kennedy.

Messrs. MONROE, BISBEE & GIBBS, for appellee Sampson Kennedy.

Mr. JUSTICE WALKER delivered the opinion of the Court:

It appears that William Kennedy, the ancestor of appellees, and his wife, on the 15th of June, 1854, made a trust deed, conveying about sixty acres of land adjoining the city of Chicago, to Hugh T. Dickey, to secure the sum of $5000 and interest, due to Francis G. Blanchard in three years from that date. The interest was payable semi-annually. The deed contained a full power to sell, by the trustee, in case of default in making the payments.

The interest was regularly paid until the maturity of the principal, by the sons of the grantor, who had died intestate on the 24th of July, 1854. He left eight children at the time of his death, four of whom were minors, of whom were appellees Theodore W. Kennedy, Catharine J. Palmer and Sampson Kennedy. On the 9th of October, 1857, Dickey, acting under the trust deed, and for a default in not paying the principal and the last installment of interest, sold the land, together with other property, to the adult heirs, James Kennedy, who was guardian of the minor heirs, and William Kennedy, who, with his brother Alexander, were adminis-

trators, and to George W. Kennedy. They subsequently borrowed money, and pledged the land as security for its payment, but at maturity the debt was paid and the heirs discharged. They also conveyed to the Ft. Wayne and Chicago Railroad Company the right of way of their road on the west line of the tract.

On the 1st day of February, 1859, Alexander, James M., William W. and George H. Kennedy, mortgaged the premises in controversy, together with other property, to one Turner P. Westry, to secure $20,000; and on the same day they, by trust deed, conveyed it, with the other property, to John V. Le Moyne, as trustee for one John Arrington, to secure two notes payable to him, due in nine months, amounting together to $3000. This debt was incurred by the Kennedys for services, real or pretended, in procuring the $20,000 loan from Westry, and was subsequently claimed to have been for usury, and it was also claimed that the loan by Westry was usurious.

About the 16th day of November, 1860, default was made in the payment of accrued interest on the $20,000 debt, and in paying the $3000 debt to Arrington, and Westry and Le Moyne commenced proceedings to foreclose the trust deed and mortgage. James M., William W., George H., William, by his next friend, and others, brought a suit in equity, in the circuit court of Cook county, and obtained a temporary injunction, restraining the sale of the land 'under the trust deed and mortgage. Among other things, the bill charged that Alexander had died, leaving William Kennedy surviving, and that he was his heir. On the hearing of that case, the court found that the mortgagors owed Westry and Arrington over $16,000 on the trust deed to secure the $3000 and the mortgage to secure the $20,000, and ordered its payment by a specified time, and in default thereof, that the bill be dismissed and the injunction dissolved. The money to redeem not having been paid, on the 21st of October, 1861, the injunction was dissolved and the bill dismissed.

Before that bill was dismissed, about the 18th of March, 1861, Sampson Kennedy, Theodore W. Kennedy, Catharine J. Kennedy, (now Palmer,) then infants, by George E. Semple, their next friend, and others by their attorneys, Farwell and Smith, filed their bill in the Superior Court against Arrington, Le Moyne and Wm. Kennedy, and others, upon which an injunction was granted restraining a sale of the land. In this bill it was charged that the original indebtedness to Blanchard was fully paid previous to the sale by Dickey, and that the sale was null and void; that Alexander had died intestate, and that William was his heir, and claimed an interest in the premises. The complainants, to secure Farwell and Smith, their attorneys, for their professional services, executed to them two separate mortgages, on the 25th day of May, 1861, which were, on the 28th, duly recorded. The mortgages recite the commencement of the suit; that Farwell and Smith were to receive one-fifth of what might be recovered thereby.

By agreement made by Farwell, Le Moyne, Arrington and Semple, and the adult heirs, except Sampson, on the 23d day of January, 1862, to place the property in Arrington, Le Moyne sold, under the trust deed, this land, with other property, to Farwell, without consideration, and he, on the same day, conveyed it to Arrington, without any other consideration than the satisfaction of his debt. On the next day, Semple, William W., George H. and James M., with their wives, conveyed, by quit-claim deed, all of their interest in this and other lands to Arrington, in satisfaction of the Westry mortgage for $20,000, and in discharge of the $3000 secured by trust deed. These deeds were all recorded on the 21st of March, 1862; and, as a part of the agreement, on the 7th day of April, 1862, the suit was dismissed by stipulation, at complainants' costs. On the 4th day of September, 1862, Arrington conveyed this tract to Robert W. Hyman. On the 19th day of January, 1864, Hyman conveyed this land to Frederick H. Winston, for the benefit of appellants. The

two mortgages to Farwell and Smith were not released until after Winston's purchase, and by his procurement.

On these facts, the bill in this case was brought in the Superior Court by Sampson Kennedy, Theodore W. Kennedy and Catharine J. Kennedy, in November, 1868, against appellants and others. William Kennedy filed a cross-bill, by his next friend, but coming of age a few days before the trial, he was admitted to prosecute in his own name. The original bill prayed that the rights of the respective parties should be ascertained, and a partition be decreed of the premises, or, if that can not be done, that complainants be compensated in money. Answers were filed, as well as replications, proofs were heard, and the court below found that Theodore W., and Catharine J. Kennedy, since intermarried with one Palmer, were seized of, and entitled to, an estate in fee simple, as tenants in common of an undivided one-fourth part of these premises, less the strip of one hundred feet in width granted for right of way to the Chicago, Rock Island and Pacific Railroad Company; that the Chicago, Rock Island and Pacific Railroad Company and the Lake Shore and Michigan Southern Railroad Company are the owners in fee of an undivided three-fourths of the premises; that Sampson Kennedy has no title to or interest in the premises; that William Kennedy owns no interest in the premises, and denies the relief sought by his cross-bill. The court decreed a partition to be made, by assigning two-eighths of the premises to Theodore W. Kennedy and Catharine J. Palmer, and six-eighths to the two railroad companies, and appointed commissioners to make the partition, and this appeal is prosecuted to reverse that decree.

It is urged that the abstract fails to show that the proper notice of the sale was given, and that the conveyance by Dickey passed no title. It is recited in his deed that "Whereas, default hath been made in the payment of said sums of money, the premises were, by the said party of the first part, duly noticed and advertised for public sale, at the north door of

the court house, in Chicago, in the county and State aforesaid, on the 9th day of October, A. D. 1857, in the manner prescribed in and by said deed of trust, and was, upon said day and year, and at the place last mentioned aforesaid, in pursuance of said notice and advertisement, sold at public sale." This statement, contained in the deed, is all that is essential to be recited in reference to the notice, time and place of sale. It is virtually saying, that the sale was duly made in the manner required by the deed of trust. If such a recital was not held sufficient, every particular, however minute, would have to be recited in the deed. By no reasonable construction of the language employed can it be held to mean that the first notice was published on the 9th day of October, the day the sale was made.

It is urged, in favor of a reversal, that the evidence fails to show that the debt to Blanchard was paid before the sale was made by Dickey, and that, as there is no other irregularity in that sale, appellees must be held to be concluded from asserting any claim to the land. If the money was still due to Blanchard when the sale was made, no reason is perceived why the adult heirs of William Kennedy, deceased, could not purchase the land at the trustee's sale, and acquire the title, unless prevented by occupying a fiduciary relation to the other heirs, nor why they did not become the owners by their purchase at that sale; but if, on the other hand, the debt was paid, the power conferred on the trustee never became complete. It was a conditional power, which could only be exercised after default in payment should occur; and a sale without such default, and consequently without power, could not confer anything beyond the legal title in trust for the benefit of the heirs of the grantor, especially to a person having or being chargeable with notice that there was no default. If there was none in this case, then the purchasers at that sale knew the fact, as there is no pretense that any other person paid the debt. Appellees claim that it was paid before Dickey made the sale, and appellants contend that the

payment was made afterwards, and for the land under their purchase.

Does the evidence show that the Blanchard debt was paid before the premises were sold under the trust deed? We think it preponderates strongly in favor of such a payment. Blanchard testified that the notes were, he thinks, paid, at maturity, to his agents, George Robbins & Sons, in New York; and Stampoffski testified that he raised the money to pay Blanchard—$5250—and so told Wadsworth, of whom he got the $5250; that he forwarded it to New York, to Robbins & Sons, to pay the notes, and, in the course of a week subsequently, the notes came back canceled, and that he turned them over to William Kennedy; that he personally sent the money; that he bought the draft of Wadsworth, and Kennedy requested him to send it to Blanchard, and he wrote a letter and forwarded it to him; that it was in June, 1857; that he sent it directed to Robbins & Sons, in their care; that he also wrote a letter to Blanchard, notifying him that the money was in New York.

W. W. Kennedy swears that the $5000 was paid at maturity; that he knew it, because he saw the note and had possession of it, and it was produced in evidence in the first suit; that he had possession of it immediately after its payment, on the 15th of June, 1857; would say it came to his possession about the 27th of that month; that he knew it was paid, because he and his brother James M. Kennedy raised the money to pay it, and he sent on and got the note back; that the notes for the interest were paid at maturity, as he and his brother paid and received them, and he had them until they were destroyed by the fire, in October, 1871.

This evidence seems to be direct and clear to the point that the money was raised on the note of the Kennedys, with Stampoffski as surety, and that Wadsworth discounted the note and furnished the exchange on New York, and that the note was paid in June, 1857; nor do the discrepancies claimed to exist between their evidence militate against its credibility.

358     C., R. I. & P. R. R. Co. *v.* KENNEDY *et al.* [Sept. T.

Opinion of the Court.

It is no greater, and is of the character we would naturally expect to find, after such a length of time. They fully concur in all of the main facts, although differently detailed. Had they differed in nothing, then it would have been, no doubt, urged that they had previously compared their evidence, and agreed as to what they would swear. Such slight differences in unimportant matters, under the circumstances, rather lend weight to, than detract from the force of the evidence.

Nor does the evidence of Wadsworth and Woodbridge overcome or counterbalance this evidence. The former says he owned the note, but of whom he obtained it, what he paid or when he procured it, he does not pretend to say. He says that his recollection is indistinct, but he thinks he collected it. He by no means pretends that he held the note before its maturity, or that he purchased it of Blanchard; nor does he say it was ever delivered to him as collateral security. He by no means intimates that the other witnesses are mistaken in their version of the matter. He says he would not remember having the note if it were not for what Dickey told him. He does not remember who went with him to see Dickey in reference to the sale. He does not place much, if any, confidence in his recollection, and we think it too vague and indefinite to carry with it much weight.

Woodbridge says that Blanchard held an incumbrance on the property, or that it was so represented to him; and, if he is not mistaken, a question arose whether the property could be sold, under the incumbrance, without control of the paper, and that he advised that it could not be done; that if they wished to sell, it must be done at the instance of the holder of the paper. He thinks Wadsworth commenced negotiations to purchase the notes of Blanchard, that he might direct the sale; that he does not know whether Wadsworth conferred with Blanchard or not, or whether he purchased the notes. He, however, thinks that course was pursued. It will be observed that the witness testifies with caution, and only

states mere impressions. He states little or nothing as matter of fact, but simply as to what he thinks. This evidence, we think, fails to overcome the evidence of complainants' witnesses, nor does it impair the force of their testimony. Again, it is a significant fact that Blanchard says the notes were paid at maturity. He says nothing about negotiations with Wadsworth in reference to selling him the notes. If that had been done, he certainly would have known the fact; but he says he never sold them or ordered their sale. He would surely have been consulted, or applied to, to sell them, as he owned them until they were paid. He, however, says he may have indorsed them to Robbins & Sons for collection, but authorized no sale.

Nor can it be reasonably inferred from the evidence on the part of the defendants below, and much less when all of the evidence in the case is considered, that Wadsworth purchased the notes and kept the lien alive. It shows no such intention, but that they were paid in the usual course of business; and William W. Kennedy swears that, when he received the notes, he drew black lines, with ink, over the signatures. In this, he is uncontradicted by any witness or circumstance.

We, then, have no hesitation in saying that the evidence shows that the notes were paid, the debt discharged and the notes canceled, before Dickey sold, and the Kennedys bought, the premises.

It is a natural inference, from the circumstances as they appear in this record, that, after the financial stringency set in, James M. and William W. Kennedy being in business, and needing means to carry it on, and to avoid failure, resorted to the expedient of one of them going, with Wadsworth, to see Dickey, and to request him to sell under the trust deed, that they might purchase the lands and raise money on them. This view of the case is greatly strengthened, when it is seen that the Kennedys paid nothing on their purchase to the trustee; and it is strange that William W. should, when prices were so greatly depressed, be anxious to

have his interest, and that of his brothers and. sisters, sold, when he must have known the time was unfavorable, and it would be at a great sacrifice, unless it was that he and James might thus procure the land; and as the evidence shows that they were borrowers at the time, we can not suppose they had surplus means to invest in real estate, whilst borrowing to carry on their business as merchants. The most reasonable conclusion is, that the plan was devised to resort to these notes and the power contained in the trust deed, to place themselves in a position to raise the $20,000, for the negotiation of the loan of which they agreed to pay the enormous sum of $3000 to Arrington, besides, we know not at what rate of interest. This all shows that they were not in a position to purchase real estate, and pay for it $5250 in hand; but by inducing Dickey to sell for the amount of the satisfied notes, they could thus obtain the appearance of title to the land, and on it place themselves in funds.

It is urged, that the sale by Dickey having been made after the debt to Blanchard was paid, it was void as to subsequent purchasers, with or without notice. We think that, if the debt was paid, the power to sell never became active or operative, and was undeniably voidable in the hands of the purchasers, with notice of the payment. To hold otherwise, would be to sanction fraud and oppression; and we suppose no well considered case can be found, either in the British or American courts, which holds that such a sale to such a purchaser, or his grantee, with like notice, can be sustained as against the person creating the trust, or those claiming under him; but inasmuch as the person executing the trust deed selects the trustee, and chooses to invest him with such large powers over the title and his pecuniary interests, it may be seriously doubted whether he should not be required to sustain the injury flowing from the abuse of that power, rather than an innocent purchaser, who is led to believe that he can rely upon the integrity of the trustee chosen by the person creating the trust. One of two persons must suffer the loss,

and it would seem but equitable and just that it should be
borne by him who has enabled the trustee to commit the fraud,
or, from negligence or incapacity, has done the wrong.

To hold that the purchaser must, at his peril, know that
the debt is not paid, or lose the land and the money paid for
it, would seem to be a rule that would, in many cases, operate
harshly, if not very unjustly. The mere production of the
notes by the creditor would not prove the fact, as payment is
frequently made and receipts given, and the notes neither
taken up nor canceled; or the maker may be absent and
inaccessible to the purchaser, or a variety of contingencies
may be supposed, which would render it difficult, if not im-
practicable, to ascertain the fact. To so hold, would greatly
depreciate the price of the property, not only at the trustee's
sale, but in all others subsequently made, until the debt
should be barred by the Statute of Limitations, or a release
of the debt should be procured from the creditor; but there
are numerous respectable authorities which seem to announce
a different rule. In the view, however, which we have taken
of this case, we deem it unnecessary to decide this question,
as it is controlled by other and different well recognized
rules.

Are appellants *bona fide* purchasers? That they have paid
a sufficient consideration, is satisfactorily shown; nor can it
be successfully contended that they had actual notice of the
rights of appellees, before or at the time their agent purchased
the land; but we think they were charged with such notice.
In *Doyle* v. *Teas*, 4 Scam. 202, the rule was stated that, "when
the court is satisfied that the subsequent purchaser acted in
bad faith, and that he either had actual notice or might have
had that notice had he not wilfully or negligently shut his eyes
against those lights which, with proper observation, would
have led him to knowledge, he must suffer the consequences
of his ignorance, and be held to have had notice, so as to
taint his purchase with fraud in law. It is sufficient if the
channels which would have led him to the truth were open

before him, and his attention so directed that they would have been seen by a man of ordinary prudence and caution, if he was liable to suffer the consequences of his ignorance. The law will not allow him to shut his eyes, when his ignorance is to benefit himself at the expense of another, when he would have had them open and inquiring, had the consequences of his ignorance been detrimental to himself and advantageous to the other."

The same rule was recognized by this court in the cases of *Rupert* v. *Mark*, 15 Ill. 541, *McConnel* v. *Reed*, 4 Scam. 123, *Merrick* v. *Wallace*, 19 Ill. 486, *Morrison* v. *Kelly*, 22 Ill. 610, also, in *Morris* v. *Hogle*, 37 Ill. 150, and other cases in this court; and the same rule is found in the adjudged cases both in the British and American reports, and by various text-writers. As to what acts are sufficient to put a party on inquiry, the courts may have differed; but they are in harmony as to the rule, that whatever is sufficient to put a party on inquiry which would lead to the truth, is in all respects equal to, and must be regarded as, notice. Thus, where deeds are recorded, a purchaser is put on inquiry as to the title, and must be held to have examined the record and seen the deeds thus recorded. Again, where recitals are contained in a deed, in the chain of title, he will be presumed to have seen and read it, because a prudent man is presumed to have examined the title before he purchases, and has thus had such notice as would put him on inquiry as to the nature and extent of the claim or incumbrance referred to in the recital; and it is his duty to examine the record, and to ascertain what it contains relating to the title, before he purchases; and failing to do so, he is charged with the consequences of his neglect.

Then, was there anything of record in the courts of Cook county, or in the registry of deeds, disclosing the rights of appellees, or which would have led a prudent man to inquire where information could have been obtained of the nature and extent of their claim?

There was on record a power of attorney, executed by Sampson Kennedy to George E. Semple, which recited that Wm. Kennedy died, leaving eight children, heirs at law, and real estate, including this 60 acres, and that, by reason of certain acts and doings of James M. and others, the rights and interests of Sampson, Theodore W. and Catharine, had become involved; also a mortgage from Sampson Kennedy, executed on the 25th day of May, 1861, to Messrs. Farwell & Smith, and another from Elizabeth and her husband, to the same attorneys, in both of which it was recited that a suit had been commenced in the Superior Court of Cook county, by the mortgagors and others, against Westry and others, to recover their interest in this land; that the suit referred to was a bill filed by Elizabeth and her husband, and by appellees by their next friend, Semple, which set up the facts as they are stated in the bill in this case, and that this bill had been dismissed, by agreement of counsel, without any finding or adjudication whatever. This all appeared of record when Winston purchased in trust for appellants, and they, through the trustee, are chargeable with all that came to his knowledge, or which he should have learned from the knowledge he received.

It was said in *Morris* v. *Hogle*, 37 Ill. 150, that the law presumes that a purchaser inspects the public records through which title must be derived, before receiving a conveyance, and that he was chargeable with all that appeared therein; and he was held, in that case, to have known that the decree of the court was void for the want of jurisdiction over the defendants. On the same principle, and for the same reason, appellants must be presumed to have seen the records in the recorder's office, and learned all that the deed, mortgages and powers of attorney relating to this land disclosed. They could not trace title or ascertain whether there were incumbrances on the land, without resort to these records. The registry of deeds is created to enable all persons to do so, and failing to avail themselves of the information they

afford, they are presumed to have assumed all the risk of want of, or defects in, the title, and occupy the same position as if they had inspected the record and learned all it discloses, as well as such facts as it pointed them to, and they could have learned, had they made the necessary inquiry.

This being so, they stand charged with all the records disclosed, and all that they could have reasonably learned by inquiry in the direction to which they pointed. The recitals in the mortgages and power of attorney disclosed the fact that appellees claimed an interest in this land, and unerringly pointed to a bill which had been filed in the Superior Court, and remaining on file therein, which fully disclosed the nature, grounds and extent of that claim. They had but to call upon the clerk of that court to have been fully informed of the claim, and that the bill had been dismissed by counsel without any adjudication or action of the court, or anything to estop appellees from asserting their rights. This would also have informed appellants that appellees were minors, and not capable, in law, of binding or estopping themselves from asserting those rights, and that whatever was done in dismissing the suit, was by their attorneys and their next friend. These facts they could, on inquiry, have readily learned had they not closed their eyes to these sources of information, and they are as fully chargeable with notice of the rights of appellees, as if they had received actual notice.

Nor could the next friend or their attorneys do any act, not sanctioned by a decree of the court, which would estop appellees in the assertion of their rights in this land. Being minors, they could not have irrevocably bound themselves by deed, not to sue for and recover their interest in the premises, nor could any other person place them in any worse position. A next friend can only claim and pursue the rights of a minor, and is powerless to yield or cede them to others. And the same is true of their attorney. A court may, by judgment or decree, bind them, but not attorneys or the next friend. Nor does it appear from the order dismissing the

bill that there was the slightest intention, on the part of any one, that appellees were to be estopped or barred from asserting their rights in the future. The order left all parties occupying the same relation to each other as they did before. We do not wish to be understood as asserting, however, that appellants would have been required to examine this bill, there then being no suit pending, had not the mortgages and power of attorney have pointed to it as an unerring means of learning the nature and extent of the claim of appellees. On that question we express no opinion.

It is again urged that appellees are estopped by having received a portion of the money derived from a sale of other property, which was released from the Arrington or Westry mortgage when the arrangement was entered into by the parties, by which Farwell was to purchase this tract, and convey it to Arrington, and the suit should be dismissed. We can perceive no grounds on which to base an estoppel. They were the owners, each, of one-eighth of the property on Adams and South Water streets, and when they received a share of the money for which it was sold, they received no more, if even so much, as was their own. The sale by Dickey was void as between them and the purchasers at that sale, and Arrington and Westry released it from their mortgages, but retained an amount amply sufficient to secure their debts, and, being minors, they could not ratify and confirm that arrangement, even by a deed or release, so as to prevent them from subsequently suing for and recovering their interest in the land, much less can they be estopped by simply receiving a portion of the share of money to which they were legally and justly entitled.

It is also urged that there has been *laches* in asserting their rights by appellees. This suit was brought by them in about four years after they came of age, and they swear that they were ignorant of their rights until a short period before they sued. This we can well presume, inasmuch as their guardian and the administrators of their father's estate, who were their

brothers, had wronged them so grievously, they would be the last to call the attention of appellees to the fact that they had betrayed their trust, had ignored the protection and care of their interests which their relationship and position required, and had neglected their duties. But even had they been fully apprised of their rights, the delay is not regarded, under the circumstances, unreasonable. No rights have been acquired by other persons in the property, or material change in the property occurred after they arrived of age, and before the suit was brought.

We now come to consider what rights, if any, William Kennedy has, under his cross-bill. All we have said as to appellees, applies to him, except that his father, Alexander, was of age at the time of the Dickey sale; that he was of age at the time he joined Wm. W., George H. and James M. in the trust deed to Hurd to secure Strauss, and in the trust deed and mortgage to Arrington and Le Moyne. It is claimed that the father of complainant in the cross-bill, by joining in the execution of these deeds of trust and this mortgage, became estopped from claiming any right in the premises, and that the estoppel extends to and binds William, as his heir; that if he inherited any claim to the 60-acre tract, he received it with the estoppel, and can not now assert his claim. We fail to perceive the force of the argument. When Alexander joined in making these deeds, it was an assertion on his part that he had an interest in the property, or why join in the conveyances? And it is a fair inference, that the grantees acknowledged that Alexander had some claim of title to the land by receiving a deed from him.

Nor can it be fairly said that Alexander any more released his claim thus incumbered, than did the other grantors their title. They could, at any time, release their interest in the land, by discharging the debt, and so could Alexander do the same. Until foreclosed by sale under the power contained in the deeds of trust or mortgage, or by decree and sale, their right of redemption continued. When the debt was paid, to

secure which the Hurd deed of trust was given, no one will pretend that, had Alexander asserted title to an eighth part of this land, the execution of the trust deed to Hurd could have been set up as an estoppel to such a claim. When that debt was paid, all of Alexander's rights were restored to the same condition in which he held them at the time he joined in making the deed. It then follows, that William was not estopped, by any act done by his father, from coming in at any time before the right of redemption was foreclosed, and restoring to himself all of the rights in the premises which his father held before making the Arrington mortgage and the LeMoyne deed of trust.

Then, did the sale by LeMoyne, under the arrangement entered into by the parties, and the purchase by Farwell, and his sale to Arrington, affect William's rights? In Arrington's hands, it could hardly be claimed that it would. But, in the hands of an innocent purchaser for value, and without notice, we are clearly of opinion that he is estopped. There can be no doubt that the trustee, on default of payment, could, in pursuance to the terms of the power, sell the premises, notwithstanding the death of Alexander and the minority of his son, William. And if the sale were regular, the purchaser would take all the title held by the grantors. And even if not, in all respects, regular, if the deed contained a recital of a compliance with all of the requisitions of the power, a subsequent purchaser without notice and for value would be protected, and appellants occupy that position in this case. The deed to Farwell from LeMoyne contains all the recitals necessary to show a compliance with the terms of the power, and the record is barren of anything to put appellants on inquiry, to learn that the sale was made by such an arrangement as would cut off competition. Nor is there any pretense that they had actual notice. Having so purchased the interest held by Alexander before his death, they are entitled to protection in their purchase. Had proceedings been instituted before Arrington sold to Hyman, or had all of the remote

purchasers been charged with notice, then it may be that William could have been let in to redeem under his cross-bill, but that question is not before us for consideration.

Did Sampson's title pass, by these proceedings, to Arrington and his grantees, freed from his claim, or may he avoid the deed made by LeMoyne to Farwell as against remote grantees? This depends upon whether he had any remaining right, or has failed to resort to legal remedies in proper time to avoid the effect of these several conveyances. We have seen that the recitals in LeMoyne's deed to Farwell afford sufficient *prima facie* evidence as between him and the grantors in the deed of trust under which the sale was made, and the purchaser, that the sale was valid and in conformity with the power of sale, and is conclusive as between the grantors in the trust deed and all remote *bona fide* purchasers without notice of irregularities, or of such facts as put them on inquiry that would have led to such knowledge.

Sampson arrived at the age of twenty-one on the 23d of February, 1860. In the next autumn, he executed a power of attorney to his brother-in-law, George E. Semple, authorizing him to sue for and recover his interest in his father's estate, with power to mortgage and incumber the same. He again, in the month of May, 1861 executed a mortgage to Farwell and Smith, reciting that they had brought suit for the recovery of his interest in his father's estate, and in which he agreed to give them one-fifth part of whatever portion of his interest might be recovered. It was this suit which these attorneys settled and compromised by agreeing to the sale of the premises under the trust deed and mortgage, at which Farwell became the purchaser, and afterwards sold to Arrington, and the suit was dismissed. Was Sampson bound by this adjustment entered into by his attorneys at law and in fact? We think he was. He was of full age when he executed the warrant of attorney and the mortgage, and ratified the employment of these atttorneys. They made the compromise, of which he was duly informed when he re-

ceived his share of the proceeds of the compromise. He made no objection to it, and acquiesced in the arrangement for more than six years, before he questioned it by bringing this suit. From these circumstances, we can only infer that, if he did not, in fact, consent to the arrangement, he, by his long delay before objecting to its terms, must be held to have fully ratified the entire arrangement, and must be bound by it. He could not, after such a long acquiescence, change his mind, and retract. Had he been under disability when the compromise was made, it would have been otherwise. But he was of age, and under no disability,. and can not now be heard to challenge the settlement of his claim.

We, after a careful examination of the objections, find no grounds for setting aside the partition reported by the commissioners. It seems to be fair, reasonable and just. It may not, in all respects, be as convenient or suitable to appellants as some other would have been, but, had it suited them in all respects, it perhaps would not have either suited the convenience or interest of appellees. It was the duty of the commissioners to make a fair, equal and just division of the property, and we can not say that it has not been done.

After a careful inspection of the record, and due consideration of the legal questions involved, we have been unable to perceive any error, and the decree must be affirmed.

*Decree affirmed.*