*In re* PETITION OF COMMISSIONERS OF SNY ISLAND LEVEE DRAINAGE DISTRICT (Commissioners of Sny Island Levee Drainage District in the Counties of Pike, Adams and Calhoun, Petitioners-Appellees, v. Larry Utterback *et al.*, Objectors-Appellants; Hugh H. McNary *et al.*, Intervenors).

Fourth District   No. 4—84—0221

Opinion filed February 5, 1985.—Rehearing denied March 11, 1985.

George J. Lewis, of Lewis, Blickhan, Longlett & Timmerwilke, of Quincy, for appellants.

Matthew A. Hutmacher, of Hutmacher, Rapp & Ortbal, P.C., of Quincy, for appellees.

JUSTICE MILLS delivered the opinion of the court:

A drainage matter.

A proposed modification to Pigeon Creek Reservoir—objected to.

The trial judge found the modification "advisable."

We affirm.

## BACKGROUND

The Sny Island Levee Drainage District of the counties of Pike, Adams, and Calhoun contains 112,397 acres. The District extends from the north in Adams County to the south in Calhoun County and runs along the Mississippi River. It diverts five major creeks to the Mississippi River through a series of levees and pumping stations which involve eight pumps with a total pumping capacity of 1 million gallons per minute. The District has 14 separate reservoirs, only one of which—the Pigeon Creek Reservoir—is involved in this appeal.

Pump Station No. 1 serves 38,000 acres within the District and 80,000 acres of total watershed. Of the 38,000 acres within the District served by Pump Station No. 1, only 18,000 are affected by the Pigeon Creek Reservoir. At Pump Station No. 1, there are two pumps, each with a 450 cubic feet per second (cfs) capacity. The original design plan called for 1,100 cfs capacity, but modifications replaced the need for 200 cfs. The United States Army Corps of Engineers designed the Pigeon Creek Reservoir to last 25 years, after which rehabilitation of the levees was contemplated. Such rehabilitation was reflected in what is known as Design Plan No. 3, which was filed with the county clerk after it was proposed by the Army Corps of Engineers and incorporated by the District. The Corps designed the reservoir to have water-holding capacity of 4,800 acre/feet, a discharge capacity of 450 cfs, and capacity to receive 2,100 acre/feet of silt. The silt was to be deposited over the 25-year design life of the reservoir. And if silt was deposited as estimated, the levees would have to be raised or rehabilitated after the 25-year design life. The levee surrounding Pigeon Creek Reservoir was designed to be 475.3 feet above mean sea level (elevation 475.3), and the emergency spillway elevation was to have been 472.3 feet elevation. The spillway was placed where it was felt minimum damage would occur if the reservoir was ever overtopped.

The reservoir was constructed in 1962 for the primary purpose of storing water, controlling flooding, and preventing silt from going into the Sny—which is a drainage ditch that runs along the north-south route of the entire District. The reservoir was designed to hold water as it ran off hillsides in the eastern portion of the District. At the time of its design, the Corps of Engineers predicted that only

once in 10 years would ponding south of Pigeon Creek Reservoir reach a maximum elevation of 453. Ponding over this level causes flooding of lands around Pump Station No. 1. Evidence submitted at trial showed that there were 10 interior floods above elevation 453 between 1966 and 1981.

In response to the problem of interior flooding, the District undertook a study of the entire system in an effort to determine how to alleviate the problem. The study was undertaken in 1975 and resulted in the listing of several reasons for the interior flooding as well as some suggested cures. The reasons for the flooding included an increased percentage of runoff from rains, increased seepage (water which flows through the ground under a levee) from the Mississippi River, and increased static head (the pressure exerted by a larger volume of water which is held next to a smaller volume) from the Mississippi River which reduces pumping capacity. The suggested cures included increasing the pumping capacity of Pump Station No. 1, which would have cost each landowner approximately $90 per acre, plus other suggested modifications at the pump station, including flaring the pipes. The 1975 study made no recommendation concerning restricting the outlet from Pigeon Creek Reservoir.

In a supplementary report prepared in 1982, the District's engineer recommended, among other things, modification of Pigeon Creek Reservoir, as well as modification of other settling basins in the District, in an effort to reduce the onslaught of water which occurred immediately after a heavy rainfall. As a result of the subsequent study, a modification was proposed which is the subject of this appeal.

The modification proposed was that a wall would be constructed around the current mechanical outlet. The wall would be built to an elevation of 465 and in the wall would be installed a single 54-inch outlet. The modification would result in a single exit through which the water would flow, rather than the two 54-inch outlets which now exist. If the water ever reached an elevation of 465, the additional stored waters would go over the top of the new wall into what would then be a drop box and would then be discharged through both 54-inch outlets. It was admitted at trial that the modification would extend the time to empty the reservoir from 9.67 days (the present emptying rate) to 18.48 days.

Upon filing the petition which would authorize the suggested modification, the drainage district was met with petitions of the objectors who are the appellants in this appeal. The objectors argued variously that: the modification was not advisable, the modification was precluded by language in deeds which were held by persons who had purchased land in the reservoir, and the modification could not be under-

taken until the commissioners obtained flowage and seepage easements from landowners whose property abutted the levees of the reservoir.

Hearings on the petition and the objections took place over the next year and eventually resulted in the court—at bench— finding that while the modification was *not necessary*, it was *advisable*. While noting that there was a possibility of increased seepage, the court also found that the District need not obtain easements or condemnation of the surrounding lands prior to constructing the proposed modification. The court finally found that the proposed modification of the outlet structure was included within the rights of "operation, maintenance, and repair" which was reserved by the District when it sold the land lying within the basin at public auction. Based on these findings, the trial court authorized the proposed modification.

This appeal followed and appellants have again raised the three aforementioned objections which question the sufficiency of the evidence to support the finding of the advisability of constructing the wall, as well as the legal basis of the court's decisions pertaining to the deeds and the absence of necessity to obtain easements.

We affirm.

## I. THE WALL

■ The appellants, without citation to authority, argue that various facts adduced during this trial show that it was not advisable to modify the Pigeon Creek Reservoir's outlet structure in the suggested manner because there was an insufficient showing that the suggested modification would satisfactorily accomplish the sought-after results. Appellants also set forth a laundry list of facts which they feel somehow militate against the modification, but the specific manner is unspecified.

Appellees respond, again without citation to authority, to appellants' arguments by pulling out portions of their side's evidence which they urge countered the testimonial factors on which the appellants rely. The only legal argument made by appellees which goes to the issue in this portion of the appeal involves the standard of review called for when a court is asked to set aside the decision of a trial court in a drainage case.

Appellees' argument is that reviewing courts will not disturb the findings of a lower court unless such findings are contrary to the manifest weight of the evidence. (*Wintersteen v. National Cooperage & Woodenware Co.* (1935), 361 Ill. 95, 197 N.E. 578.) While this is the general rule that obtains in matters of civil review, our own research of drainage cases reveals that the rule maintains with special force in

this area of the law. As a matter of fact, we could find no case wherein a lower court's findings of fact were reversed.

The only instance of a lower court's order being tampered with at all was our decision in *In re Petition to Levy Assessments* (1974), 19 Ill. App. 3d 125, 310 N.E.2d 454. In that case, the trial court had issued an order which stated that the drainage district, in consummating a plan to clear growth from the sides of a drainage ditch, was to follow a detailed plan, but that in following the plan, the district was to retain all trees which did not thwart the overall purposes of adequate and efficient draining. The plan which was eventually filed called for the removal or eradication of all the growth along the ditch which included all the trees. That this was the gist of the plan was corroborated by testimony of the district's engineer. We felt that the order was self-contradictory and therefore partially vacated the order and remanded the cause in order to allow the trial court to state more specifically what was to be done and how it was to be accomplished. Although the propriety of the court's original determination of the advisability of the plan was not attacked on appeal, we did allude to the plan in a manner from which the standard of review in these types of cases may be inferred. We noted that in drainage cases a trial court must first determine whether or not it is advisable to engage in the proposed work. We stated that "[i]n so doing, the court must balance certain interest to determine whether the cost to the land and other property in the district will exceed the benefits." (19 Ill. App. 3d 125, 130, 310 N.E.2d 454, 459.) We further noted that the record of the proceedings established that the court had engaged in the balancing process. This in and of itself was enough to support the eventual order, as we were unwilling to attempt to rebalance the factors *sua sponte* but presumed the result of the trial court to be correct.

The posture that we took in *In re Petition to Levy Assessments* is in accordance with the posture generally taken by courts of review when confronted with claims that a trial court reached an erroneous decision concerning the advisability of actions suggested by commissioners of a drainage district. This is the case even where, as here, the evidence is conflicting. In *Union Drainage District v. Hamilton* (1945), 390 Ill. 487, 61 N.E.2d 343, the court was asked to reverse a jury verdict which found that the main tile between two pump stations in a drainage district should be repaired at a cost of $8,984.01. Both parties to the case had put on evidence at the trial level. One of the affected landowners testified that his lands were already adequately drained. He testified that none of his crops had ever been destroyed by water although some water occasionally stood on a small portion of his property. Three other witnesses who lived on or near

the land testified similarly: that the land would in no way be benefited by the suggested improvements although some water occasionally stood on small portions of their property.

The evidence put on by the district in *Union Drainage* consisted primarily of the testimony of the district engineer and two of the drainage commissioners. Each testified to having seen water on the objector's land and estimated the cash benefits of the suggested improvements to be from $5 to $15 per acre. Besides hearing the testimony of the involved parties, the jury viewed the land in question. (It was required to do so under section 17b of the levee act (Ill. Rev. Stat. 1943, ch. 42, par. 20).) While an on-site view of the land is no longer required, Judge Pezman in the case before us went to the reservoir and took testimony while making an on-site inspection just as did the jury in the *Union Drainage* case.

In addressing the appellants' argument in *Union Drainage* that the decision to make the improvement was against the manifest weight of the evidence, our supreme court stated:

> "Upon a careful examination of the record, without the advantages which the jury had of a view of the premises and of seeing the witnesses and hearing them testify, we cannot say that the verdict and judgment were palpably against the weight of the evidence. In cases of this character, where the evidence is conflicting and the jury views the premises and the verdict is within the range of the testimony, the court will not interfere with the finding of the jury as to the amount of benefits, unless there is something in the record showing that the jury was influenced by passion or prejudice or that there have been incorrect rulings by which the jury might have been misled." *Union Drainage District v. Hamilton* (1945), 390 Ill. 487, 499, 61 N.E.2d 343, 348; see also *Inlet Swamp Drainage District v. Anderson* (1913), 257 Ill. 214, 100 N.E. 909.

Although the case *sub judice* was tried to a court without a jury, it seems elementary that the case standard of review applies. Since appellants have not raised any matters which they claim might have prejudiced their case or inflamed the court, we refuse to disturb its findings as to the advisability of the suggested modifications. *Union Drainage District v. Hamilton* (1945), 390 Ill. 487, 61 N.E.2d 343.

## II. THE DEEDS

At trial, the objectors argued that the proposed modification was without the reservation of rights written into the deed through which the District conveyed lands to one of their parties. Two deeds were introduced into evidence. The deed from the District to objector

Parham reserved rights of "operation, maintenance, and repair." A deed entered into with another objector reserved the rights of "repairing, maintaining, and reconstructing the basin." From this, objectors argue that the portion of Parham's deed reserving the rights of operation, maintenance, and repair was an ambiguous restrictive covenant, that the ambiguity should be resolved against the District as drafters of the deed, and that as a result of such a construction the proposed modification was not authorized by the deed and in fact was forbidden by it. See *Labadie v. Morris* (1922), 303 Ill. 321, 135 N.E. 733.

Petitioners respond that the deed to Parham was given in open contemplation of the powers and duties of the drainage district and that therefore the words must be construed with those duties and powers in mind. They argue further that Parham was on at least constructive notice of the possibility of modifications, since Design Memo No. 3 (which specifically stated that modification of the reservoir was contemplated) was incorporated into an order for additional assessments which was on file in the Pike County circuit clerk's office.

Petitioners support their argument for constructive notice by citing *Chicago, Rock Island & Pacific R.R. Co. v. Kennedy* (1873), 70 Ill. 350, where the court held that a power of attorney on file in a separate suit involving a parcel of land was sufficient constructive notice to eventual purchasers of the land that the title was in question.

Petitioners also cite cases wherein the power of "modification" was inferred from particular circumstances. In one, *Baldozier v. Mayberry* (1939), 226 Iowa 693, 285 N.W. 140, the court held that a drainage district was entitled to undertake substantial modification of a stream bed which would have eventually cut through the stream bank and found its way to its old bed had a suggested modification not been made. Objectors attempt to distinguish *Baldozier* as a case wherein a court approved a water district's actions which were taken to prevent an existing structure from falling into a state of disrepair, whereas here there are no allegations that Pigeon Creek Reservoir is in a state of disrepair.

■ While this argument does serve to distinguish *Baldozier*, our opinion is that the words of right retention in the deed to Parham were sufficient to put him on notice that widely varied undertakings were permissible—and indeed contemplated—by the drainage district. This is especially true in light of the duty courts have placed on drainage districts to make additions, improvements, and enlargements in light of the best interest of the district as a whole. Further, the right to make substantial changes in the drainage districts is compelled by the legislative mandate that "[t]he commissioners *shall \*\*\* keep the*

*drains, levees, pumping plants and other works of the district in operation and repair"* (emphasis added), which is found in section 4—15 of the Illinois Drainage Code. (Ill. Rev. Stat. 1983, ch. 42, par. 4—15.) Courts have (based on the aforementioned statute) been willing to construe the duties of commissioners as a ground for the employment of the extraordinary remedy of *mandamus* to compel action on the part of the district where a resident feels he is not receiving his share of the benefits. (See *Satterfield v. Fairfield Drainage District* (1958), 18 Ill. App. 2d 379, 152 N.E.2d 406.) Under these circumstances, it would seem to be only fair to allow the District to avoid a suit by taking appropriate actions on their own volition.

In conclusion, our opinion is that the reservation of the right of "operation, maintenance and repair" in the deed to Parham was sufficiently broad in scope to cover the suggested modification. Further, we find that Parham was on at least constructive notice of the statutory duty imposed on drainage districts, as well as the possibility of extensive modifications which were contemplated in Design Memo No. 3, on file in the Pike County courthouse.

III. The Easements

■ The objectors' argument on this issue has the virtue of being syllogistic. The *major premise* is that all parties agree that if the proposed modification is completed, water will be stored for longer periods of time at higher levels in Pigeon Creek Reservoir than had previously been the case. The *minor premise* is that water seepage is directly proportional to the height of stored water and the length of time the water is stored and that there is already existent seepage. The *conclusion* is that the seepage will worsen to the point of there being a "taking" which requires condemnation proceedings.

Petitioners respond that even if seepage worsens, there is no showing that it would ever approach the situation before the court in *People ex rel. Pratt v. Rosenfield* (1948), 399 Ill. 247, 77 N.E.2d 697, where the court found that no taking had occurred.

In our estimation, *Rosenfield* controls. There, appellants were property owners in Kankakee. The city council of Kankakee, the Illinois Central Railroad, and the State Public Works and Building Department undertook a joint railroad renovation project. One result of the project was that the grade of the street which ran along appellants' property was raised, which caused surface waters to run into appellants' buildings and flood the lower floors. Appellants sought a writ of *mandamus* which would have ordered the appellees to proceed under the Eminent Domain Act, by condemning their property and paying them damages. All defendants filed motions to dismiss, which

were allowed. The supreme court affirmed, noting that none of plaintiffs' property was taken by the improvement and that the damages complained of were not of a sufficiently lasting nature to amount to a taking. The most important factor cited by the court was that the waters complained of were not permanent, but were temporary and came as a result of rain or snow.

The same factual situation is present here. Many of the witnesses testified that the seepage problems were bad when the reservoir had water in it but that the problems cleared up when the reservoir was down. No one contended that the proposed modification would result in water being constantly held in the reservoir in such a manner as to cause water to constantly stand in the objectors' lands. Since the problem with seepage was admittedly temporary, the holding of *Rosenfield* controls and the trial court was correct in finding that it was unnecessary for the District to seek easements or condemnation of the objectors' property.

Based on the foregoing discussion, we affirm the decision of the trial judge in all aspects.

Affirmed.

GREEN, P.J., and TRAPP, J., concur.